312 P.2d 155

Mary Riordan CHAMBERS, Appellant,

v.

STATE of Arizona, ex rel. Robert MORRISON, The Attorney General, and the Board of Regents of the State Colleges and University of Arizona, Appellees.

No. 6237.

Supreme Court of Arizona.

May 31, 1957.

Shimmel, Hill & Cavanagh, Phoenix, for appellant.

Robert Morrison, Atty. Gen., and Gordon G. Aldrich, Asst. Atty. Gen., for appellees.

PHELPS, Justice.

Appellee Arizona State College at Flagstaff, brought an action in eminent domain against appellent Mary Riordan Chambers, to condemn a triangular shaped piece of land consisting of 4.15 acres of a 14-acre tract adjoining the college on the west. In connection with land now owned by the college the land is to be used as a training school site. The appellee

will hereinafter be designated as the college and the appellant as Mrs. Chambers.

The trial court, sitting without a jury, entered a judgment of condemnation in favor of the College and against Mrs. Chambers, who appeals herein and presents five assignments of error. Four of the five assignments, in the final analysis, are directed at the question of "necessity". It is urged that the findings and conclusion of the trial court on this question are not supported by substantial evidence.

A.R.S. § 12–1112 sets out the prerequisites to the taking of property by condemnation. Before property may be taken under the circumstances of this case it must appear that: (1) the use to which the property is to be applied is a use authorized by law, that is, a public use, and (2) the taking is *necessary* for such use.

Mrs. Chambers does not argue that property taken for the building site of a training school is not a public use, but instead, contends that the second prerequisite is absent, in that, there is no *necessity* for the taking because the new proposed training school can be located on the college campus on land presently owned by the College.

The principal question then becomes: Is there present in the record, substantial evidence to support the findings and conclusion of the trial court to the effect that *necessity* exists for condemnation.

We will hereinafter analyze the evidence bearing upon this question to determine if there is substantial evidence to support the judgment of the trial court.

Dr. Eastburn, president of the College, testified that the Board of Regents found it imperative to build a new training school building which would serve as a laboratory school to house over 200 students from the kindergarten to the 6th grade, and which will contain class rooms for students taking courses in teaching; that a certain amount of playground area is needed for the children in the laboratory school; that the need for the training school has been under consideration by the entire educational staff for the past seven years; that there is other land on the campus that might be suitable but that it was not usable because of the distance from other buildings, which would make the costs of heating, tunneling, drainage and fill too great; that it would cost $150,000 just to run the heating and utilities tunnel to the next nearest possible location; that the College owns approximately 164 acres; that accessibility to other places on the campus is a major factor in location, since students travel from building to building between classes; that the College enrollment for the last academic year was 908; that enrollment is predicted to run to 2,000 by 1970; that a temporary site utilization plan for development of the campus was drawn up

by a competent architect, Leslie J. Mahoney, seven years ago, but that it is out of date because of the many changes during that period; that there are certain temporary class rooms and structures indicated on the Mahoney plan, which, the College at some future time intends to replace, but which are still useful and will be costly to replace; that the present training school is too small and outmoded; that there is no playground for the children and there are no class rooms available for college class instruction in connection with the training school; that a plan sponsored by Mrs. Chambers, through her architect Beanfield, hereinafter referred to as the Beanfield plan, would place all buildings on the present campus but this would (1) entail the removal of nine buildings, and (2) it would be necessary to secure from the legislature funds amounting to one million dollars for building replacement.

Virgil W. Gillenwater, head of the department of education, testified that under the standards recommended by the American Association of School Administrators, at least seven acres will be needed for the new training school and its dual purposes.

Col. R. McClellan Beanfield, a consulting mechanical engineer, testifying for Mrs. Chambers, stated that he had prepared a plan to place the proposed training school on the campus in such a way as to utilize the land already owned by the College (this plan is an exhibit in evidence). That under his plan the following structures are recommended for removal: (a) *temporary* class room building, (b) *temporary* offices, (c) machine shop, (d) hot house, (e) infirmary, (f) garage, (g) repair garage, and (h) three frame dwellings. He stated that in his opinion, acquisition of the triangular piece of property in question was unnecessary.

Mr. Atkinson, the registered architect who designed the plans for the training school building, testified that he believed ten acres to be a minimum area for the training school plot; that he had nothing to do with selecting the triangular location in question; that generally, the essence of successful location of buildings depends upon site plan utilization; that under the Beanfield plan a road would have to be taken out, causing a consequent traffic problem; also, that under the area outlined in the Beanfield plan, the power plant would have to be moved and that the expense would be terrific since the original building cost $750,000 and all the underground tunnels are directed to that location; that even if the road were removed and the power plant left in place, there would be a safety problem because there would be children playing in an area where all the College maintenance occurs; that the buildings that would have to be removed, under the Beanfield plan, still have a present useful life

of ten to fifteen years; that it was his opinion, as an architect, that he would not want to locate the training school in such a "restricted" area as urged under the Beanfield plan; that it is desirable to utilize campus space according to a *steady* plan; that the training school building plotted under the Mahoney plan contained 12,000 square feet in contrast to the new proposed structure of 40,000 square feet; that the other proposed plan, to fit the training school building into the present campus at another location as suggested by Mr. Shimmel and Dr. Bursch, would not be advisable because the building would have to be turned in such a manner that bad climatic exposures would result; and that in Flagstaff it is necessary to orient or place a building so that (1) the entrance gets some winter sun, (2) there is no ice condition, and (3) the people who work, live and teach in the building can have desirable sunlight in the room.

Walter Runke, Jr., superintendent of buildings and grounds, testified that there is a "lake area" on the south 80 acres of the campus, south of the cottages, which collects water during the rainy seasons and is subject to flooding, and that it would require "fill" if chosen as a site for the training school.

Dr. Charles Bursch, head of the planning office of the Sacramento, California Department of Education, testifying for Mrs. Chambers, stated that he has occupied a position in that capacity for twenty-one years; that his previous experience has not been in an altitude comparable to the Flagstaff area, but that it has extended to mountain country with heavy rainfall; that on the question of necessity in this case his opinion would be based upon (1) accessibility to elementary students and college students, (2) relationship of the proposed building (to other buildings), (3) the normal function of a building of that designated size, (4) the activities of the children outside the building (playgrounds, etc.), (5) orientation of windows to control glare, heat and cold, (6) soil bearing value of the land and ability to surface with grass or some other suitable surfacing, (7) the drainage problem, and (8) the shape of the land for "safety zones" to protect the children; that it was his opinion that the training school could not function properly on the triangular piece of land in question, and finally, that it is impossible to properly determine the question of need without a site utilization plan. Both Beanfield and President Eastburn recognize the same considerations and that the four-acre tract involved herein is, in itself, inadequate to take care of the training school needs. It is of course, the purpose of the state, under its present plan, to utilize a part of the campus for the total plan which will aggregate approximately eight acres.

Mary Riordan Chambers, defendant land owner, testified that the source of her title

in the land in question was as sole distributee of her father's estate; that her entire tract is 14 acres; that if the 4.15 acre triangular piece of land is taken it will block an entrance to her remaining 9.85 acres to the south; that "a few years past" she was requested by the college to sell the triangular part of her land and that she refused on the ground that the college did not need it; that her last "use" of the land was to play golf on it about 30 years ago and that it hasn't been used by her since then except "to walk around it."

It is our conclusion that all of the testimony outlined above and the supporting exhibits (plans, pictures and maps) show that there is present in the record, substantial evidence to support the findings and conclusion of the trial court on the question of necessity. It was clearly shown that other land already owned by the college was not suitable for the proposed training school site, primarily because of inaccessibility, in that, the distance was too great and consequently, the costs of heating, tunnelling, drainage and fill would be prohibitive. In addition, the college administrators had the construction program under consideration for a period of seven years and although they had not formally modified the original "Mahoney" site utilization plan, it was reasonable under the evidence, for the trial court to find as it did find, that the contemplated site was a result of "planning and study."

The alternative plans proposed by Mrs. Chambers would compel the college to destroy structures that will have a useful value from ten to fifteen years and the loss of which would result in great expense to replace. Much emphasis was placed on the fact that some of these structures are wooden and classified as "temporary" on the original "Mahoney" site utilization plan, but the evidence also shows that the "Mahoney" plan was designed merely as a guide for future use and not as a rigid layout inflexible to the needs of a growing college, and as above stated, provided for a building of only 12,000 square feet, whereas, the present plans contemplate a 40,000 square feet structure.

The remaining assignment urges that the trial court erred in excluding and declining to consider certain proffered testimony of Mrs. Chambers. The offer of proof shows that seven years ago she had made a verbal commitment to a Catholic priest in Flagstaff (now deceased), to give a portion of the land in question to the officials of the District Catholic Church, to be used for a Newman Club adjoining the campus. It is argued that this testimony was admissible on the question of necessity to show that Mrs. Chambers presently had a use for the land and that under her prior commitment she would suffer "private injury" if

the land were condemned. The gist of this argument is based on our statute A.R.S. § 12–1115, which provides in part:

"Where land is required for public use, the state, or its agents in charge of such use, may survey and locate the land, *but it shall be located in the manner which will be most compatible with the greatest public good and the least private injury.*" (Emphasis supplied.)

This provision of our eminent domain statute was adopted from California and has been interpreted by the courts of that state to require a balancing of the greatest public good and the least private injury in locating land for condemnation. See, Montebello Unified School Dist. of Los Angeles County v. Keay, 55 Cal.App.2d 839, 131 P.2d 384. It was also held in Los Altos School District of Santa Clara County v. Watson, 133 Cal. App.2d 447, 284 P.2d 513, that it is not necessary for the state to plead compliance with the above provision, but that the defendant must make it an issue (by his pleadings or otherwise); and if it then becomes an issue the defendant has the burden of proof. It is our view that these cases are reasonable interpretations of the statute involved. It therefore follows that evidence on the part of Mrs. Chambers, relative to the "uses" she had made and intended to make of the land in question, may have been material on the question of her "private injury" in the ultimate balancing of the greatest public good and the least private injury. However, it is our view that the refusal of the trial court to consider the proffered evidence did not prejudice Mrs. Chambers in the ultimate determination of this cause, for the reason that the court would then have presented to it the question of whether the greatest public good required the taking of the lands of a Newman Club. As to this, the public uses of the state would still override the possible private injury to that organization, even one with as worthy purposes and objectives as this.

This conclusion is irresistibly true when considered in the light of the words of the California court interpreting this provision as expressed in the case of Montebello Unified School Dist. of Los Angeles v. Keay, supra. We quote [55 Cal.App.2d 839, 131 P.2d 387]:

"And we think that when an attempt is made to show that the location made is unnecessarily injurious the proof ought to be clear and convincing, for otherwise no location could ever be made. If the first selection made on behalf of the public could be set aside on slight or doubtful proof, a second selection would be set aside in the same manner, and so ad infinitum. The improvement could never be secured, because, whatever location was

proposed, it could be defeated by show-ing another just as good."

In the final analysis, we therefore hold that the pertinent findings and conclusion of law of the trial court are supported by substantial evidence in the record.

Judgment affirmed.

UDALL, C. J., and WINDES, STRUCK-MEYER and LA PRADE, JJ., concur.