88 P.3d 557

Linda LINDSAY and Larry Lindsay, wife and husband, Plaintiffs–Appellants,

v.

CAVE CREEK OUTFITTERS, L.L.C., an Arizona corporation, Defendant–Appellee.

No. 1 CA–CV 02–0375.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 2, 2003.

Review Denied April 19, 2004.*

* Justice Hurwitz voted to grant review.

Treon, Strick, Lucia & Aguirre, P.A. By Richard T. Treon and Arthur G. Newman, Jr. and Curt W. Clausen, Phoenix, Attorneys for Plaintiffs–Appellants.

The Cavanagh Law Firm, P.A. By Ralph E. Hunsaker and Christopher Robbins, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

GARBARINO, Judge.

¶ 1 The plaintiffs, Linda and Larry Lindsay, appeal the trial court's grant of summary judgment in favor of the defendant, Cave Creek Outfitters, L.L.C. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶ 2 The Lindsays brought suit against Cave Creek, the operator of a riding stable, for personal injuries sustained by Linda when she was thrown from a horse. The Lindsays alleged that Cave Creek's conduct had been both negligent and willful and outrageous.

¶ 3 While vacationing in Arizona, Linda and her friend Pam decided to take a horseback ride. When the two women arrived at the riding stable, they were greeted by Cave Creek's staff. They were interviewed as to their previous riding experience. Linda said that she had ridden in the past, but was not an experienced rider. Cave Creek's staff discussed the basics of horseback riding.

There was no discussion concerning the hazards of desert riding.

¶ 4 While Linda, Pam, and the other guests were waiting for their horses, Cave Creek's employees presented them with pre-printed release forms that had to be completed. The release form consists of a two-page document entitled "Release and Waiver of Liability, Assumption of Risk, and Indemnity Agreement." The first page requires each guest to fill in a name and address at the top and sign at the bottom. In between are nine typewritten, single-spaced paragraphs containing various terms. Linda filled out and signed the form where indicated, dated it, and returned it to Cave Creek's employees.

¶ 5 Linda testified that she had merely glanced at the form and had not read it. She assumed that "it was the typical release you have to sign to go out on a ride." Linda further testified that "it did not look like a legal document." She thought the form confirmed that she would not hold Cave Creek responsible for her mistakes. Cave Creek's employees did not discuss the terms of the release with her.

¶ 6 Linda and Pam were assigned a guide named Dan. Dan told them that he had just been hired and had only worked for Cave Creek for about one week. The group traveled only a few hundred yards from the stable when Dan's horse started misbehaving. The misbehavior did not last throughout the entire ride, although there were several incidents when the horse did act up.

¶ 7 The ride proceeded with the horses at a walk, single file, with Dan's horse in the lead. Linda had never ridden in the Arizona desert before. She was generally aware of cactus, the large ones with spikes; but not with Cholla cactus, which she described as "a cute little powder puff feathery ball."

¶ 8 Dan did not take them on an established trail. Instead, they made their way through the desert, where they encountered brush and cacti. Dan said he was avoiding marked trails in an effort to disorient his horse and keep it from trying to return to the stable. Linda's horse was walking along behind Dan's horse when it suddenly began to buck violently. Linda was thrown from her horse. After Dan checked on Linda's condition, he began picking cactus spines from Linda's horse. Linda could see blood on the horse where the spines had been pulled out. Linda believes the cactus caused her horse to buck.

¶ 9 Cave Creek moved for summary judgment on the basis of the release signed by Linda before the ride began and also on the basis of the immunity provided by Arizona Revised Statutes (A.R.S.) section 12–553 (2003). The trial court granted the motion, ruling that although the release did not exculpate Cave Creek from liability as a matter of law, Cave Creek was entitled to immunity from negligence under A.R.S. § 12–553. The trial court also found that a triable issue was presented as to whether Cave Creek had been guilty of gross negligence. Following this ruling, the Lindsays withdrew their claim of gross negligence and a final judgment of dismissal was entered. The Lindsays filed a timely notice of appeal. This Court has jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## DISCUSSION

¶ 10 The Lindsays raise three issues on appeal. First, the Lindsays argue that the trial court erred by ruling that Cave Creek was entitled to immunity under § 12–553. Second, the Lindsays contend that § 12–553 is unconstitutional because it violates the anti-abrogation clause found in Article 18, Section 6, of the Arizona Constitution. Finally, the Lindsays claim that § 12–553 is unconstitutional because it violates the equal protection clause found in Article 2, Section 13, of the Arizona Constitution.

### I. *Standard of Review*

¶ 11 We review de novo the trial court's entry of summary judgment. *Gonzalez v. Satrustegui*, 178 Ariz. 92, 97, 870 P.2d 1188, 1193 (App.1993). Summary judgment is proper if there is no genuine issue of material fact. *Orme Sch. v. Reeves*, 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). "[W]e view all facts and reasonable inferences therefrom in the light most favorable to the party against whom [summary] judgment was en-

tered." *Bothell v. Two Point Acres, Inc.,* 192 Ariz. 313, 315, ¶ 2, 965 P.2d 47, 49 (App.1998).

## II. *Immunity Under § 12–553*

¶ 12 The facts of the present case are similar to those in *Morganteen v. Cowboy Adventures, Inc.,* 190 Ariz. 463, 949 P.2d 552 (App.1997). In *Morganteen,* the plaintiff signed a release that was substantially identical to the release in this case. *Id.* at 464, 949 P.2d at 553. During the trail ride, the plaintiff was injured when she was thrown from a horse. *Id.* The plaintiff maintained that when her horse started to skitter, the trail guide instructed her to "[p]ull on the reins," which the defendant later admitted was improper advice. *Id.* The trial court granted summary judgment in favor of the defendant, concluding that by signing the release, the plaintiff had waived her right to sue the defendant. *Id.* This Court reversed, holding that a plaintiff's "tort remedies may not be waived unknowingly." *Id.* at 466, 949 P.2d at 555. We reasoned that " '[a]n actual bargain must be made' to establish an 'intentional relinquishment of a known right.' " *Id.* (quoting *Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 385, 694 P.2d 198, 215 (1984)).

¶ 13 At the time *Morganteen* was decided, A.R.S. § 12–553 was not in effect. *Id.* at 464 n. 1, 949 P.2d at 553 n. 1. Section 12–553 immunizes an equine owner from an ordinary negligence claim by a person riding the equine if the following four conditions are established:

1. The person has taken control of the equine from the owner or agent when the injury or death occurs.

2. The person ... has signed a release before taking control of the equine.

3. The owner or agent has properly installed suitable tack or equipment....

4. The owner or agent assigns the person to a suitable equine based on a reasonable interpretation of the person's representation of his skills, health and experience with and knowledge of equines.

¶ 14 This statute played no role in the analysis of the release in *Morganteen.* 190

Ariz. at 464 n. 1, 949 P.2d at 553 n. 1. Section 12–553, however, was in effect at the time that Linda was injured and impacts on our decision. The issue in this case is whether Cave Creek is immune from liability because it has met all of the conditions required by § 12–553.

¶ 15 The Lindsays do not maintain that Linda was not in control of the horse, that Cave Creek improperly installed the tack or equipment, or that Cave Creek assigned Linda a horse not suitable for her skill and experience. Moreover, the Lindsays admit that Linda signed the release prior to taking control of the horse. The Lindsays contend that issues of fact remain as to whether Linda was given time to read the release, whether the release contained language that no person could understand, and whether Cave Creek knew that Linda did not read the release before she signed it.

¶ 16 Section 12–553(A)(2) only requires that the rider sign a release before taking control of the equine. Its language does not require an equine owner to give the signor time to read the release, nor does it require an equine owner to inquire of the signor as to whether they have read the release. We do not suggest that the legislature intended to absolve an equine owner from liability if their releases are structured so that riders do not have time to read or understand them before signing them. This, however, is not an issue here. Linda never indicated before beginning her ride that she did not have time to read the release or that she did not understand it. In fact, the record reflects that she joked about parts of the release with her companion and thought that it "wasn't a big deal." Although she now makes the claim that there was insufficient time to read and understand the release, we find no merit to that contention.

¶ 17 Section 12–553(E)(2) defines the term "release" as

a document that a person signs before taking control of an equine from the owner or owner's agent and that acknowledges that the person is aware of the inherent risks associated with equine activities, is willing and able to accept full responsibility

for his own safety and welfare and releases the equine owner or agent from liability unless the equine owner or agent is grossly negligent or commits wilful, wanton or intentional acts or omissions.

Section 12–553(E)(2) is not clear whether a valid release must "specifically and explicitly recite[ ], verbatim, each of the acknowledgments" listed. *Bothell,* 192 Ariz. at 319, ¶ 18, 965 P.2d at 53. We hold, however, that § 12–553(E)(2) simply provides a general description of the information that a document must contain in order for it to be considered a release. If the legislature had intended that a document recite verbatim the acknowledgments found in § 12–553(E)(2), it would have included language to such affect. *See Canon Sch. Dist. No. 50 v. W.E.S. Const. Co.,* 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994) (explaining that fundamental to statutory interpretation "is the presumption that what the legislature means, it will say" (quoting *Padilla v. Indus. Comm'n of Ariz.,* 113 Ariz. 104, 106, 546 P.2d 1135, 1137 (1976))).

■ ¶ 18 The document that Linda signed contains sufficient information to be considered a release under § 12–553(E)(2). The release in question contains an acknowledgment that Linda knew of the inherent risks associated with riding a horse. Paragraphs one and two provide as follows:

I HEREBY:

1. Acknowledge that a horse ... may, without warning or any apparent cause, buck, stumble, fall, rear, bite, kick, run, make unpredictable movements, spook, jump obstacles, step on a person's feet, push or shove a person, saddles or bridles may loosen or break—all of which may cause the rider to fall or be jolted, resulting in serious injury or death.

2. Acknowledge that horseback riding is a dangerous activity and involves RISKS that may cause SERIOUS INJURY AND IN SOME CASES DEATH, because of the unpredictable nature and irrational behavior of horses, regardless of their training and past performance.

By executing the release, Linda acknowledged her willingness to take full responsibility for her own safety and welfare. Paragraph three of the release specifically provides that she "[v]oluntarily assume[s] the risk and danger of injury or death inherent in the use of the horse, equipment and gear provided to me by Stable." The document also releases Cave Creek from liability. Paragraphs four and five provide that Linda

4. RELEASE[S], DISCHARGE[S] AND PROMISE[S] NOT TO SUE the Stable, doing business under its own name or any other name and/or any of its owners, officers, employees and agents (hereinafter the "Releasees"), for any loss, liability, damage, or cost whatsoever arising out of or related to any loss, damage, or injury (including death) to my person or property.

5. Release[s] the Releasees from any claim that such Releasees are or may be negligent in connection with my riding experience or ability including but not limited to training or selecting horses, maintenance, care, fit, or adjustment of saddles or bridles, instruction on riding skills or leading and supervising riders."

Finally, the last sentence, which is directly above the signature line, clearly and unambiguously sums up the terms of the document. This sentence reads, "I HAVE READ THIS DOCUMENT. I UNDERSTAND IT IS A PROMISE NOT TO SUE AND A RELEASE AND INDEMNITY FOR ALL CLAIMS." The foregoing language found in the document signed by Linda clearly establishes that she was promising not to sue Cave Creek.

■ ¶ 19 The Lindsays argue that Cave Creek does not qualify for immunity under § 12–553 because the execution of a release only immunizes an equine owner from liability for injuries caused by the inherent risks of equine activities. The Lindsays allege that Cave Creek was negligent by not warning Linda of the risk of the cholla cactus and by leading Pam and Linda off of the trails in areas where such cactus was located. According to the Lindsays, these allegations create a question of fact because "negligent trail guidance is not an inherent risk of a trail ride." *Morganteen,* 190 Ariz. at 464, 949 P.2d at 553.

¶ 20 "Inherent risk" is addressed in § 12–553(E)(2). To fall within the definition of "release" found in § 12–553(E)(2), the document must provide an acknowledgment that the signor is aware of the inherent risks of activities related to horse back riding. It, however, is not a complete limitation upon an equine owner's immunity. Subsection (B) provides that an equine owner cannot be released from liability if the owner is "grossly negligent or commits wilful, wanton or intentional acts or omissions." § 12–553(B). The document that Linda signed releases Cave Creek from liability for all claims of negligence, including negligent "instruction on riding skills or leading and supervising riders." Accordingly, we hold that the trial court did not err by granting summary judgment in favor of Cave Creek pursuant to § 12–553.

## III. *Anti–Abrogation Clause*

¶ 21 The Lindsays argue that § 12–553 is unconstitutional because it takes away the right of an injured rider to sue an equine owner for ordinary negligence. The anti-abrogation clause provides that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." Ariz. Const. art. 18, § 6. The legislature does not violate the anti-abrogation clause if it imposes regulations on the ability of a plaintiff to bring a negligence action as long as there are reasonable alternatives or choices that enable such plaintiff to bring a cause of action. *Barrio v. San Manuel Div. Hosp., Magma Copper*, 143 Ariz. 101, 106, 692 P.2d 280, 285 (1984). The legislature may not, however, use the guise of regulation to so affect the fundamental right to bring a cause of action as to completely deprive a plaintiff of a claim for ordinary negligence. *Id.* Granting a plaintiff a reasonable election of remedies is a form of regulation that does not implicate the anti-abrogation clause. *Id.; Ruth v. Indus. Comm'n of Ariz.*, 107 Ariz. 572, 575, 490 P.2d 828, 831 (1971). Therefore, a statute limiting recovery does not violate the anti-abrogation clause unless it "completely abolishe[s]" the cause of action. *Barrio*, 143 Ariz. at 106, 692

P.2d at 285; *Ruth*, 107 Ariz. at 575, 490 P.2d at 831.

¶ 22 The Lindsays cite to language contained in *Clouse ex. rel. Clouse v. State*, 199 Ariz. 196, 16 P.3d 757 (2001), for the proposition "that changing a standard of proof from negligence to gross negligence for a particular subclass of tort victims would violate" the anti-abrogation clause. *Id.* at 207, ¶ 42, 16 P.3d at 768. The issue in *Clouse* is significantly different from the issue in the present case. In *Clouse*, our supreme court did not apply the anti-abrogation clause. *Id.* at 198–99, ¶¶ 10–11, 16 P.3d at 759–60. Instead, the supreme court addressed whether the immunity clause found in Article 4, Section 18, of the Arizona Constitution "permits the legislature to define those instances in which governmental immunity prevents or limits actions against the state." *Id.* at 202, ¶ 20, 16 P.3d at 763. The supreme court concluded that the immunity clause provided the legislature with that authority. *Id.* at 203, ¶ 24, 16 P.3d at 764. Although, there is language in the dissent that supports the Lindsays' proposition, the holding in *Clouse* is not helpful in the disposition of the present case.

¶ 23 The Lindsays cite *Young v. DFW Corp.*, 184 Ariz. 187, 908 P.2d 1 (App.1995), for the same proposition that they cite *Clouse*. In *Young*, the legislature enacted a statute that required a plaintiff to establish more than general negligence to prove dram shop liability. *Id.* at 188, 908 P.2d at 2. In holding that the statute is unconstitutional, this Court explained that the statute did "not merely 'regulat[e] the mode, method, and procedure to be followed in pursuing the cause of action ... [but] completely deprive[d] many who have sustained real injury of judicial remedy.'" *Id.* at 190, 908 P.2d at 4 (quoting *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 19, 730 P.2d 186, 196 (1986)).

¶ 24 Section 12–553 is unlike the statute in *Young*. In *Young*, the statute denied all plaintiffs alleging dram shop liability the right to proceed under ordinary negligence principles. *Id.* at 188, 908 P.2d at 2. In contrast, § 12–553 does not deny all injured equine riders the right to sue for ordinary negligence. Instead, it denies ordinary

negligence claims to those who have elected to sign a release and who meet the other criteria laid out in § 12–553(A). The law allows a party to voluntarily enter into a contract releasing another party of liability. *Valley Nat'l Bank v. Nat'l Ass'n for Stock Car Racing, Inc.*, 153 Ariz. 374, 377, 736 P.2d 1186, 1189 (App.1987) (explaining that absent public policy to the contrary, parties can enter into an agreement releasing one of the parties from liability). Section 12–553(A) simply enforces the release signed by an equine rider. Accordingly, ordinary negligence is still available to all injured equine riders, except those riders who have signed a release waiving that right. Section 12–553 does not completely deprive injured equine riders of a remedy and, thus, it does not violate the anti-abrogation clause.

## IV. *Equal Protection*

¶ 25 Arizona's Equal Protection Clause provides that "[n]o law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. 2, § 13. "Equal protection is not intended to prohibit all unequal or discriminatory treatment, but is intended only to require equal treatment of persons similarly situated in a given class and this classification itself is reasonable and not discriminatory." *Lindsay v. Indus. Comm'n of Ariz.*, 115 Ariz. 254, 256, 564 P.2d 943, 945 (App.1977).

¶ 26 The Lindsays argue that § 12–553 violates the equal protection clause because it creates a gross negligence burden of proof for a particular subclass of tort victims. The Lindsays contend that the trial court erred by applying a rational basis standard in upholding the constitutionality of § 12–553. The Lindsays rely upon *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984), to support their contention that the ability to bring a negligence claim is a fundamental right and, thus, strict scrutiny should be applied because § 12–553 burdens this fundamental right.

¶ 27 In *Kenyon*, our supreme court applied strict scrutiny to a statute of limitations provision that discriminated between two different types of malpractice claims and also between different types of medical malpractice plaintiffs. *Kenyon*, 142 Ariz. at 83, 688 P.2d at 975. The statute in *Kenyon* required a plaintiff to bring a medical malpractice claim "within three years 'from the date of injury.'" *Id.* at 72, 688 P.2d at 964 (quoting A.R.S. § 12–564(A)). The supreme court interpreted the statute to apply at the time injury occurs, regardless of whether the injury is discovered, thus, abolishing the discovery rule. *Id.* at 76, 688 P.2d at 968. Therefore, the statute discriminated against different classes of medical malpractice plaintiffs—those with discovered injuries versus those with undiscovered injuries. *Id.* at 83, 688 P.2d at 975. Moreover, the statute "discriminate[d] against those with claims against licensed health care providers as distinguished from all other malpractice claims." *Id.* The supreme court held that the statute was unconstitutional to the extent that "it purports to abolish or limit the discovery rule in medical malpractice cases." *Id.* at 87, 688 P.2d at 979.

¶ 28 Section 12–553 does not treat equine riders who have suffered an injury different from other tort victims. A claim for ordinary negligence is still available for injured equine riders unless the equine rider chooses to sign a release. By signing the release, Linda placed herself in a class different from other injured equine riders and ordinary tort victims who have not signed a release. In order for Linda to suffer from a violation of the equal protection clause, § 12–553 must treat Linda in a manner inconsistent with those similarly situated who have signed a release. *See Salt River Pima Maricopa Indian Cmty. Sch. v. State*, 200 Ariz. 108, 111, ¶ 9, 23 P.3d 103, 106 (App.2001) (explaining that equal protection does "not require things which are different in fact or opinion to be treated in law as though they were the same" (quoting *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982))). Because § 12–553 does not treat Linda different from others in her class, a rational basis analysis is applied.

¶ 29 To survive a rational basis analysis, a statute must serve a legitimate

state interest and it must rationally further the state interest. *Parker ex. rel. Parker v. Arizona Interscholastic Ass'n, Inc.,* 204 Ariz. 42, 48, ¶ 17, 59 P.3d 806, 812 (App.2002). Section 12–553 was a response to an increase in litigation costs and liability insurance premiums for equine owners and agents. *Bothell,* 192 Ariz. at 319, ¶ 20, 965 P.2d at 53. Prior to the passage of § 12–553, some equine owners and agents were being deterred from continuing in the industry due to high litigation costs and insurance premiums. *Id.* Therefore, § 12–553 is designed to protect equine owners and agents from lawsuits. *Id.* at 319, ¶ 19, 965 P.2d at 53. This is a legitimate state interest and § 12–553 furthers this interest by immunizing equine owners from liability when their riders have signed a release. Accordingly, we hold that § 12–553 does not violate the equal protection clause.

## V. *Attorneys' Fees and Costs*

¶ 30 Cave Creek requests its attorneys' fees and costs in both the trial court and on appeal. The basis for its request is that paragraph nine of the release signed by Linda reads "the Undersigned will pay all attorneys' fees and costs incurred by the Stable in defending ... an action." In our discretion, we award Cave Creek its attorneys' fees and costs on appeal pursuant to paragraph nine of the release. This award is contingent upon Cave Creek's compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

## CONCLUSION

¶ 31 We affirm the trial court's judgment and we award Cave Creek its attorneys' fees and costs on appeal.

CONCURRING: DANIEL A. BARKER, Presiding Judge and JON W. THOMPSON, Judge.