201 P.3d 537

QUEEN CREEK SUMMIT, LLC, an Arizona limited liability company; Rite of Passage, Inc., a Nevada corporation; Canyon State Academy, Inc., an Arizona corporation; Youth Partners Foundation, an Arizona corporation; Bank of America, N.A., a federally chartered banking association, Petitioners,

v.

The Honorable Glenn DAVIS, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

Town of Gilbert, a political subdivision of the State of Arizona, Real Party in Interest.

No. 1 CA–SA 08–0205.

Court of Appeals of Arizona, Division 1.

Oct. 30, 2008.

Snell & Wilmer L.L.P. By Don Bivens, Sean J. O'Hara, Phoenix, Attorneys for Petitioners.

Ayers & Brown, P.C. By Charles K. Ayers, Joseph M. Hillegas, Jr., Melinda A. Bird, Phoenix, Attorneys for Real Party in Interest.

## OPINION

BARKER, Judge.

¶ 1 Queen Creek Summit, L.L.C. and the other petitioners (collectively, "QCS") seek special action review of the superior court's denial of their motion for judgment as a matter of law and grant of the Town of Gilbert's ("Gilbert") Application for Immediate Possession. The superior court found that QCS failed to meet its burden of proving that Gilbert had improperly concluded that the public good of locating its pipeline through the middle of Canyon State Academy outweighed the private injury to QCS. For the reasons set forth below, we affirm.

### Facts and Procedural Background

¶ 2 Canyon State Academy is an all-male residential treatment facility and school located in Queen Creek, Arizona, at the intersection of Rittenhouse Road and Hawes

Road. On March 26, 2008, Gilbert instituted proceedings against Queen Creek Summit, LLC, the record landowner of the property where the academy is located, among others, to condemn a pipeline easement through the property. Gilbert also applied for an order to be let into possession of the property. Gilbert instituted these proceedings in connection with a public water works project to run a thirteen-mile pipeline from the Central Arizona Project ("CAP") Canal to the South Water Treatment Plant.

¶ 3 Gilbert proposed to locate an east-to-west pipeline easement due north of QCS's athletic fields, running through its horse pasture. It would run parallel to and abut an existing fifty-foot wide Bureau of Reclamation ("BOR") easement on the property, essentially appending twenty feet to that easement. The BOR easement prohibits QCS from building any structures within the easement.

¶ 4 For the great majority of affected landowners, Gilbert was able to construct the pipeline along the periphery of their properties. Gilbert sited non-periphery easements on four other parcels owned by various government agencies. QCS's property is the only private property where the pipeline would bisect the parcel of land.

¶ 5 Prior to the hearing on the possession order, QCS deposed Daniel J. Spitza, P.E., the principal engineer in charge of the project team designing and constructing the pipeline. QCS questioned Spitza extensively on Gilbert's Corridor Evaluation Report, a study that analyzed two potential routes for the pipeline: (1) Ocotillo Road and (2) Queen Creek/Pima Road. The report provided a general overview of the monetary and nonmonetary impacts involved in routing the line along each of these paths. In its final conclusions and recommendations, the report recommended the route along Queen Creek/Pima Road but specifically noted that "[t]he corridor alignment around the Canyon State

Academy ... will be further evaluated during the project's design phase to determine the most feasible alignment in this area."

¶ 6 In the deposition, Spitza testified that although Gilbert initially contemplated the proposed route in mid–2006, the report specifically left open the alignment details as to QCS's property because of the need for more evaluation and a final determination. At the hearing, he asserted that the report was not intended to delineate where the pipeline would be located on anyone's property.

¶ 7 In both the deposition and at the hearing, Spitza confirmed that although Gilbert provided a comprehensive evaluation of the monetary and nonmonetary impacts as to the Queen Creek Road corridor (affecting 139 parcels) versus the Ocotillo Road corridor (affecting 216 parcels), the team did not perform a similar evaluation of the different options for siting the pipeline either around or through QCS's single parcel. Spitza Dep. 68:17–71:7, May 23, 2008; H'rg Tr. 70, June 13, 2008; Corridor Evaluation Report 3, 4.[1] However, Spitza testified that he recommended the current pipeline alignment to Gilbert only after several discussions with representatives of QCS, reviewing the different alignment options and coming to a consensus that the current alignment proposed was the preferred option of the representatives. Spitza Dep. 48:4–13, 55:2–13, 61:7–12, 84:9–13, 91:4–6; H'rg Tr. 49–51, June 13, 2008; Hr'g Tr. 12–13, June 24, 2008. Spitza identified John Motley and Barbara Ross as the representatives of QCS with whom he had conferred.[2] Spitza Dep. 48:4–8. Gilbert stipulated that it did not obtain consent from Ski Broman, the 100% owner of Queen Creek Summit, LLC, to construct the pipeline along the proposed route.

¶ 8 At the hearing, Spitza testified about the difficulties of siting the pipeline along the periphery of QCS's property. He stated that siting the pipeline along QCS's northern border would cost, at least, an additional

---

1. Because of the parties' disputes over what is in the record and what is not, e.g., infra ¶ 21, we have included record cites to certain facts.

2. The record does not specifically identify Barbara Ross's and John Motley's respective positions with Petitioners; however, it does indicate

that Barbara Ross acted as legal counsel for Queen Creek Summit, LLC, during Spitza's deposition and that John Motley was employed by Rite of Passage, the long-term lessee of the land owned by Queen Creek Summit, LLC.

$850,000 and would be complicated by the Town of Queen Creek's plan to realign Hawes Road. Hr'g Tr. 32–34, June 24, 2008. He dismissed siting the pipeline along the western and southern borders of QCS's property because of additional costs related to "a number of existing utilities and easements" and restricted space for construction. Hr'g Tr. 39–40, June 13, 2008. He also rejected building on the existing Queen Creek Road right-of-way running through QCS's property because QCS had constructed a number of buildings within that easement. *Id.* 48.

¶ 9 QCS introduced evidence that Canyon State Academy intended to expand its facilities to accommodate more students, including a field house arena built over the BOR easement and possibly built over the location for the proposed pipeline. Hr'g Tr. 42–50, 57, June 24, 2008. Rite of Passage, the long-term lessee of the property, planned to fund these expansions. *Id.* 47. A representative from Rite of Passage testified that he expected BOR to abandon its easement at some point in the future when it was no longer in use. *Id.* On cross examination, the representative admitted that he knew as early as August 2006 about Gilbert's proposal to construct the pipeline across the property and that, as of June 2008, no construction plans had been filed with the Town of Queen Creek for approval. *Id.* 51–53, 57, 62.

¶ 10 On July 1, 2008, the trial court granted Gilbert's application for the possession order and denied QCS's motion for judgment as a matter of law. In its ruling, the court found that QCS had not met its burden to show on balance that the proposed route is "unnecessarily injurious." The trial court subsequently granted an order of immediate possession on July 31, 2008.

¶ 11 This special action was filed on September 5, 2008, along with a motion to stay the trial court's order of immediate possession. We declined the request for stay on September 8, 2008, and now address the propriety of the possession order. Special action review is appropriate in this case because there is no equally plain, speedy, or adequate remedy by appeal. Ariz.Rev.Stat. ("A.R.S") § 12–120.21(A)(4) (2003); Ariz. R.P. Spec. Act. 1(a); *Orsett/Columbia Ltd.*

*P'ship v. Superior Court,* 207 Ariz. 130, 132, ¶ 6, 83 P.3d 608, 610 (App.2004) (accepting special action review of an order of immediate possession, as "Orsett's only adequate remedy is through special action").

## *Discussion*

### 1. *Burden of Proof Under A.R.S. § 12–1115(A)*

¶ 12 QCS first argues that A.R.S. § 12–1115(A) imposes "an affirmative procedural requirement" on the condemnor to establish a prima facie case that it complied with A.R.S. § 12–1115(A). QCS relies primarily upon the language in § 12–1115(A) for its argument. Section 12–1115(A) provides that "[w]here land is required for public use, the state, or its agents in charge of such use, may survey and locate the land, but it shall be located *in the manner which will be most compatible with the greatest public good and the least private injury.*" (Emphasis added.) We disagree with QCS. As described below, the Arizona Supreme Court's construction of A.R.S. § 12–1115(A) in *Chambers v. State ex rel. Morrison,* 82 Ariz. 278, 284, 312 P.2d 155, 159 (1957), forecloses this argument.

¶ 13 In *Chambers,* the defendant landowner, relying on A.R.S. § 12–1115, asserted that the trial court erred by not considering that she would suffer "private injury" if the land was condemned because she had promised the land to a priest to be used for a student center. *Id.* at 283–84, 312 P.2d at 159. In interpreting the requirements under A.R.S. § 12–1115, the court specifically accepted two propositions from California case law as "reasonable interpretations" of A.R.S. § 12–1115(A): (1) that "[t]his provision ... require[s] a balancing of the greatest public good and the least private injury in locating land for condemnation" and (2) *"that it is not necessary for the state to plead compliance* with the above provision, but that the defendant must make it an issue (by his pleadings or otherwise); and if it then becomes an issue *the defendant has the burden of* proof." *Id.* (emphasis added). *Chambers* expressly places the burden on the landowner to prove noncompliance with A.R.S. § 12–1115 and not the condemnor.

¶ 14 QCS additionally cites *Phoenix v. Harnish,* 214 Ariz. 158, 160 n. 1, ¶ 3, 150 P.3d 245, 247 n. 1 (App.2006), as support that Arizona law requires Gilbert to establish a prima facie case that it evaluated and balanced the least private injury to QCS. We do not find that *Harnish's* summary statement that the plaintiffs in that case had met the requirements of A.R.S. § 12–1115 undermines the clear directive from *Chambers* that the condemnor need not plead compliance with A.R.S § 12–1115. Nor are we persuaded by QCS's citation to California and Montana case law. Accordingly, we find that the trial court appropriately placed the burden on QCS to prove that Gilbert did not properly comply with A.R.S. § 12–1115(A).

## 2. Applicable Evidentiary Standard Under Chambers

■ ¶ 15 QCS next argues that it did not bear the burden to prove that the middle-of-campus pipeline was "unnecessarily injurious" by clear and convincing evidence. QCS asserts that the applicable standard for rebutting a condemnor's claim of compliance with A.R.S. § 12–1115 is preponderance of the evidence. We disagree.

¶ 16 In analyzing the balancing of the greatest public good against a landowner's private injury, the *Chambers* court relied upon and quoted *Montebello Unified School District of Los Angeles v. Keay,* 55 Cal. App.2d 839, 131 P.2d 384 (1942):

> And we think that when an attempt is made to show that the location made is unnecessarily injurious *the proof ought to be clear and convincing,* for otherwise no location could ever be made. If the first selection made on behalf of the public could be set aside on slight or doubtful proof, a second selection would be set aside in the same manner, and so ad infinitum. The improvement could never be secured, because, whatever location was proposed, it could be defeated by showing another just as good.

*Chambers,* 82 Ariz. at 284–85, 312 P.2d at 159 (emphasis added). We consider *Chambers* to establish a clear and convincing standard as the burden of proof, and therefore we reject QCS's assertion that a rebuttal defense need

be proved by only a preponderance of the evidence.

¶ 17 QCS asserts that *Chambers* does not apply in this case because Gilbert's witness admitted that Gilbert made no effort to ascertain QCS's private injury. For the reasons stated herein, we disagree with QCS and find that Gilbert did take into consideration QCS's private injury. *See infra* ¶ 26. We therefore reject this argument.

¶ 18 QCS additionally asserts that notwithstanding the language in *Chambers,* the differences in California's condemnation procedures warrant a different standard for Arizona. However, we are bound to follow supreme court precedent. *Espinosa v. Indus. Comm'n,* 170 Ariz. 354, 359, 824 P.2d 750, 755 (App.1991) ("This court must follow supreme court authority."); *see also Hancock v. Bisnar,* 212 Ariz. 344, 349, ¶ 22, 132 P.3d 283, 288 (2006) ("The strength of [the stare decisis] doctrine is at its apex 'when prior decisions construe a statute.'") (quoting *Galloway v. Vanderpool,* 205 Ariz. 252, 256, ¶ 16, 69 P.3d 23, 27 (2003)). Accordingly, it was not error for the trial court to require QCS to prove by clear and convincing evidence that the proposed location of the pipeline was "unnecessarily injurious."

## 3. Scope of "Least Private Injury" Inquiry

■ ¶ 19 QCS also argues that the trial court erred in considering the "least private injury" to other landowners on the thirteen-mile pipeline as a "substitute" for Gilbert's failure to consider the least private injury to QCS. Section 12–1115 requires the land to be located "in the manner which will be most compatible with the greatest public good and the least private injury." We agree that the requirement to balance the "least private injury" may require both a collective inquiry and one that is specific to each landowner. However, we do not agree that Gilbert failed to consider QCS's least private injury, and we do not agree that the trial court allowed Gilbert to consider the injury to other landowners as a "substitute" for considering the private injury to QCS.

¶ 20 Additionally, A.R.S. § 12–1115 does not mandate a specific procedure for evaluating "least private injury." Section 12–1115 does not expressly require the condemnor to prepare an exhaustive corridor evaluation report for each individual property owner. Therefore, we do not impose such a requirement on Gilbert.

¶ 21 We find that Gilbert properly evaluated and considered the private injury to QCS. QCS argues there is no evidence in the record to support this. However, the record indicates that Gilbert went to great lengths to engage QCS in the process of choosing an alignment on its property. The principal engineer in charge of the project team designing and constructing the pipeline, Dan Spitza, met with QCS representatives on multiple occasions to discuss pipeline alignment options affecting the property. Spitza Dep. 6:2–5, 47:20–23, 48:4–7, 54:19–55:13, 61:7–12, 78:4–10. Spitza recommended the current pipeline alignment to Gilbert because the representatives of QCS expressed a preference for that location. *Id.* 48:4–7, 55:8–13, 58:13–59:5, 65:4–20. QCS repeatedly emphasized that Spitza never spoke with Ski Broman, the 100% owner of Queen Creek Summit, LLC, and never formally obtained Broman's consent. Hr'g Tr. 30, 38, June 24, 2008. However, Spitza testified that he had attempted to contact Broman on multiple occasions and never received a response. Spitza Dep. 67:1–6. He also testified that the representatives he conferred with stated that they could discuss their meetings with Broman. *Id.* 56:8–10.

¶ 22 The trial court's minute entry confirms that the court did not permit Gilbert to consider the private injury of other landowners as a "substitute" for considering QCS's private injury. Rather, the trial court expressly found that Gilbert *had considered QCS's private injury* in locating the pipeline:

There was obviously some consideration by [Gilbert] of the impact of running the pipeline across Defendants' property.

There was consideration of the existing buildings and existing use of the property as well as existing facilities and a Bureau of Reclamation easement. The decision to place the pipeline at the proposed location took into consideration the potential private injury to Defendants. This is clear from the decision not to run the pipeline along an alternative right of way across the property farther to the north, due to the location of existing buildings.

. . .

[Gilbert] weighed the private impact of taking the pipeline across the Defendants' property against the complications, expense and delay of running the pipeline around the property in question. . . .

. . . .

. . . Even if it did not consider the specific plans the Defendants had for the use of the property, they did consider the impact and potential injury to the Defendants of the route.

In addition to those facts just mentioned, these findings are supported throughout the record. *See supra* ¶¶ 3, 7, 8 and *infra* ¶¶ 27, 28, 33–34. Thus, the trial court did not err as to the proper scope of the "least private injury" prong under A.R.S. § 12–1115(A). There was a factual basis for the trial court's finding.

### 4. *The Balancing Analysis*[3]

¶ 23 QCS argues that the trial court erred by ruling that Gilbert had properly considered and balanced the "least private injury" to QCS, contending that Gilbert ignored its own published determination that the pipeline should go around the school, as with every other private property affected by the project. QCS bases its assertion on depictions of potential pipeline routes found in Appendix E of Gilbert's Corridor Evaluation Report. We disagree.

¶ 24 Appendix E is entitled "Corridor Parcel Survey Information," and it provides an

---

**3.** Gilbert argues that because QCS stipulated to public necessity the issue is foreclosed. QCS stated: "Accordingly, [Gilbert's] determination that an easement is necessary never relieves [Gilbert] of its separate legal obligation to locate that easement consistent with the greatest public good and least private injury." We do not find that this statement is a stipulation to necessity. Nor need we decide whether the location analysis is a subpart of the necessity inquiry in this case.

illustrative comparison of the number of parcels affected along the Ocotillo Road corridor versus the Queen Creek Road corridor. Corridor Evaluation Report App. E. The report makes clear that it was not recommending a particular pipeline alignment as to QCS's property. The "Conclusions and Recommendations" section of the report expressly reserved determination of the alignment on QCS's property for the future after further evaluation and coordination. *Id.* 13. Moreover, the record indicates that QCS knew of the currently proposed pipeline alignment prior to the publication of the Corridor Evaluation Report. Hr'g Tr. 62, June 24, 2008; Spitza Dep. 35:21–24.

¶ 25 In balancing the private injury to QCS against the greatest public good, we find that substantial evidence supports the trial court's decision. As to the greatest public good consideration, Gilbert testified that the periphery routes would be more expensive and would involve more delays and complications than the chosen alignment. Hr'g Tr. 32–40, June 24, 2008.

¶ 26 As to private injury, QCS asserted that there were plans to expand Canyon State Academy and possibly build a field house over the same location as the pipeline. *Id.* 47–50, 57. However, QCS could not verify whether the planned structure would conflict with the easement. *Id.* 56–57. QCS admitted that it had not filed a preliminary application with the Town of Queen Creek for this expansion. *Id.* 52–53.

¶ 27 In contrast to QCS's asserted plans, QCS's improvement plan, which the Town of Queen Creek approved in January 2007, indicated that QCS intended to place two water retention areas and a parking lot over the proposed path of the pipeline. Hr'g Tr. 36–37, 53, June 24, 2008. QCS admitted that a pipeline would not prevent it from using that area for retention areas and a parking lot. *Id.* 53–54.

¶ 28 On this evidence, the trial court was not persuaded by QCS's showing of injury. In finding that QCS "failed to meet its burden," the court explained:

Defendants raise the issue of whether [Gilbert] properly considered the issue of private injury in making the decision to locate the pipeline as proposed because certain facts were not taken into consideration by [Gilbert], including the property owner's future plans for use of the property in question.

Evidence presented at the hearing established that the owner of the property had some proposed plans for expansion of the school in question. *No detailed final master plan was put in evidence,* but there was testimony that the expansion as planned would be incompatible with the pipeline location across the campus. The planning appeared to be in a preliminary state.

There was testimony as to the possibility that the Bureau of Reclamation easement might be abandoned in order for the expansion to be done. *No evidence was offered* that established that there was a significant probability that the existing easement might be abandoned *nor was there any evidence* of any affirmative or formal steps undertaken to cause the existing easement to be abandoned.

Furthermore, *no evidence was offered* that established why the campus expansion plan could not be modified to work around the pipeline location. It is undisputed that there are a number of uses the property owner could make of the land over the pipeline, including roads, parking lots and more.

(Emphasis added.)

¶ 29 We conclude that substantial evidence in the record supports the trial court's decision that QCS failed to prove that Gilbert improperly balanced the "greatest public good" and "least private injury."

### 5. *Equal Protection*

¶ 30 QCS next argues that Gilbert violated QCS's equal privileges and equal protection under the Arizona Constitution and the United States Constitution because Gilbert "applied A.R.S. § 12–1115(A) disparately to [QCS] with no rational basis for doing so." QCS bases its equal protection argument primarily on the fact that for the vast majority of the properties in the thir-

teen-mile corridor, Gilbert was able to site the pipeline along property perimeters.

■ ¶ 31 Arizona's equal privileges clause provides that "no law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. 2, § 13. Similarly, the federal Equal Protection Clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection and Equal Privileges Clauses essentially direct that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Lindsay v. Cave Creek Outfitters, L.L.C.*, 207 Ariz. 487, 494, ¶ 25, 88 P.3d 557, 564 (App.2003) (" 'Equal Protection is ... intended only to require equal treatment of persons similarly situated in a given class ....' ") (quoting *Lindsay v. Indus. Comm'n*, 115 Ariz. 254, 256, 564 P.2d 943, 945 (App. 1977)).

■ ¶ 32 We apply the rational basis test to determine the constitutionality of Gilbert's decision to locate the pipeline in the middle of Canyon State Academy's campus. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249; *Lindsay*, 207 Ariz. at 494, ¶ 28, 88 P.3d at 564. Under the rational basis test, official action "is presumed to be valid and will be sustained if the classification drawn ... is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. None of the parties contest that Gilbert has a legitimate interest in constructing a pipeline connecting the CAP Canal to the South Water Treatment Plant.

¶ 33 Gilbert asserts, and we agree, that QCS's property is not similarly situated to the other properties along the proposed pipeline route.[4] At the hearing, Gilbert provided evidence that it was able to do much of its construction in the Queen Creek right-of-way. H'rg Tr. 28, June 13, 2008. However, Gilbert did not prefer this approach for QCS's property because of the number of existing buildings in the Queen Creek right-of-way. *Id.* 48.

¶ 34 Even if QCS's property were "similarly situated" to the other properties along the route, ample evidence in the record indicates a rational basis for Gilbert's decision to locate the pipeline across rather than around QCS's property. At the hearing, Gilbert's witness testified at length that the perimeter routes would involve additional costs, complications, obstacles, and delays beyond those involved with the proposed route. *Id.* 36–46. Conserving public funds and time is a rational basis for Gilbert's decision. Accordingly, we hold that Gilbert did not violate QCS's equal protection rights and equal privileges.

### *Conclusion*

¶ 35 For the foregoing reasons, we affirm the trial court's judgment and order of immediate possession.

MICHAEL J. BROWN, Presiding Judge and ANN A. SCOTT TIMMER, Chief Judge.

---

4. Gilbert also asserts that QCS waived this argument because QCS raised it for the first time in its motion for new trial. Because we conclude there is no equal protection violation, we need not decide this issue.