160 P.3d 1186

Catherine SMYSER, surviving spouse of Aaron Smyser, deceased, on behalf of herself and Jamie Smyser and Michael Smyser, minor children of decedent; Carole Smyser and Rex Smyser, surviving parents of decedent, Plaintiffs–Appellants,

v.

CITY OF PEORIA, a public entity, Defendant–Appellee.

No. 1 CA–CV 05–0202.

Court of Appeals of Arizona, Division 1, Department T.

June 12, 2007.

the following reasons, we affirm the judgment in part but vacate the award of sanctions and remand for entry of an amended judgment in the City's favor.

Palumbo Wolfe Sahlman & Palumbo PC by Anthony J. Palumbo, Scott I. Palumbo, Harris, Powers & Cunningham by Tonya K. MacBeth, Phoenix, Attorneys for Plaintiffs–Appellants.

Ridenour Hienton Kelhoffer Lewis & Garth PLLC by Robert R. Beltz, Thomas S. Zia, Phoenix, Attorneys for Defendant–Appellee.

Devlin Law Firm PC by Lisa M. Sommer Devlin, Phoenix, Attorneys for Amicus Curiae Southwest Ambulance.

Sanders & Parks PC by David J. Damron, Phoenix, Attorneys for Amicus Curiae City of Phoenix.

THOMPSON, Judge.

¶ 1 Catherine Smyser, individually and on behalf of her children and the parents of her late husband, Aaron Smyser, appeals from a jury verdict in favor of the City of Peoria (the City) in her medical malpractice and wrongful death suit. Catherine argues that the superior court erred in finding that (1) Arizona Revised Statutes (A.R.S.) § 9–500.02(A) (Supp.2005) is a constitutionally permissible grant of qualified immunity to the City for its provision of emergency medical services, (2) provision of such services is a governmental function, (3) the statute does not abrogate a cause of action for simple negligence in violation of the Arizona Constitution, (4) Catherine was not entitled to a spoliation of evidence instruction, and (5) the City could ask witnesses if the City's paramedics and emergency medical technicians (EMTs) had used their best efforts. Catherine also asserts that the trial court erred in awarding a monetary sanction to the City based on a pre-trial offer of judgment. For

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Catherine filed an action for medical malpractice and wrongful death against the City and Southwest Ambulance and Rescue, Inc.[1] in November 2000. She alleged that the City's paramedics[2] and EMTs who responded to Aaron's 911 call failed to properly treat his severe asthma attack. The paramedics rendered emergency medical care and transported Aaron to a hospital, but he died of anoxic brain damage a few days later.

¶ 3 The City moved for summary judgment and, relying on A.R.S. § 9–500.02(A),[3] contended that no evidence established that its personnel were guilty of intentional misconduct or gross negligence in treating Aaron. Without such evidence, the City was entitled to the qualified immunity granted by the statute and could not be liable for Aaron's death. Section 9–500.02(A) provides in part:

A city or town or its officers and employees, a private fire or ambulance company whose services are procured by a city or town or its officers and employees ... who performs emergency medical aid, *when rendering emergency medical aid provided by an emergency medical technician, an intermediate emergency medical technician or a paramedic ... is not liable for civil or other damages* to the recipient of the emergency medical aid as the result of any act or omission in rendering such aid or as the result of any act or failure to act to provide or arrange for further medical treatment or care.... *This subsection does not apply if the person providing emergency medical aid is guilty of gross negligence or intentional misconduct.*

(Emphasis added). In its motion, the City argued that no reasonable jury could find

---

1. Southwest Ambulance settled the claims against it and is not a party to this appeal.

2. According to the City, paramedics are qualified to perform advanced life support while EMTs are not.

3. In 2004 and 2005, the legislature adopted amendments to that statute that do not affect our analysis.

that it had acted with gross negligence in rendering emergency aid, and thus it was entitled to judgment as a matter of law.

¶ 4 Catherine's response and cross-motion for summary judgment alleged that the City was not entitled to immunity and, alternatively, that fact questions existed regarding whether the City and its employees were grossly negligent. She argued that (1) A.R.S. § 9–500.02(A) violates the anti-abrogation clause, Article 18, Section 6, of the Arizona Constitution; (2) providing emergency medical services was not a governmental function; (3) multiple acts of negligence could constitute gross negligence; and (4) causation was a question for the jury. In Catherine's cross-motion, assuming that A.R.S. § 9–500.02(A) was invalid or did not apply, she argued that the City should be liable for ordinary negligence.

¶ 5 The trial court found that questions of material fact existed as to whether the City was guilty of gross negligence and denied summary judgment on that issue. Later, the trial court concluded as a matter of law that A.R.S. § 9–500.02(A) is a permissible regulation and not an unlawful abrogation because no cause of action could have been brought against a city for simple negligence when the Arizona Constitution was adopted. Furthermore, the City's provision of emergency medical services was a governmental, rather than proprietary, function. The trial court accordingly denied Catherine's cross-motion. The case went to trial on the question of gross negligence, and the jury returned a verdict in the City's favor. Catherine timely appealed.

## DISCUSSION

¶ 6 On appeal, we consider whether the trial court erred by (1) finding that the City is entitled to qualified immunity, (2) finding that the provision of emergency medical services is a governmental function, (3) finding that A.R.S. § 9–500.02 is constitutional, (4) refusing to give a spoliation of evidence instruction, (5) permitting the City to ask witnesses whether the EMTs and paramedics were "trying their best," and (6) enforcing the City's unapportioned offer of judgment.

### A. Denial of Catherine's motion for summary judgment and finding that the City was entitled to a gross negligence defense

¶ 7 In reviewing the trial court's ruling on a motion for summary judgment, we determine de novo whether any genuine issues of material fact exist and whether the trial court properly applied the law. See *United Servs. Auto. Ass'n v. DeValencia*, 190 Ariz. 436, 438, 949 P.2d 525, 527 (App.1997).

### 1. Application of the immunity clause

¶ 8 We review de novo questions of statutory interpretation and constitutional claims. See *Badia v. City of Casa Grande*, 195 Ariz. 349, 352, ¶ 11, 988 P.2d 134, 137 (App.1999) (citation omitted). Whether the City is immune from suit for negligence is not a factual question but a question of law for the court. See *Galati v. Lake Havasu City*, 186 Ariz. 131, 134, 920 P.2d 11, 14 (App.1996) (whether city was covered by statute granting immunity for exercise of a legislative function is a legal question).

¶ 9 Catherine first contends that, by its plain language, the immunity clause of our constitution does not apply to suits against a city and thus infers that the legislature was not authorized to adopt a statute granting even qualified immunity. The immunity clause states that "[t]he Legislature shall direct by law in what manner and in what courts suits may be brought against the State." Ariz. Const. art. 4, part 2, § 18. Catherine also asserts that statutes, such as A.R.S. § 9–500.02, that grant governmental immunity are to be construed narrowly rather than expansively. See *Doe ex rel. Doe v. State*, 200 Ariz. 174, 176, ¶ 4, 24 P.3d 1269, 1271 (2001) (agency has absolute immunity for fundamental governmental policy decisions but qualified immunity for specific decisions granting or denying licenses).

¶ 10 To support her contentions that the immunity clause does not apply to the City, that the City is not a functional equivalent of the State, and thus that the legislature could not adopt a statute conferring immunity on a city or town, Catherine cites *Clouse ex rel. Clouse v. State*, 199 Ariz. 196,

16 P.3d 757 (2001). The statute at issue in *Clouse* conferred immunity on public entities and employees for failing to retain an arrested person in custody unless the public entity or employee intended to cause injury or was grossly negligent. A.R.S. § 12–820.02(A)(1) (2005). The plaintiffs sued the State Department of Public Safety (DPS), a DPS deputy, and a county, and the defendants argued that they were immune from liability unless the plaintiffs could show gross negligence. *Id.* at 198, ¶ 5, 16 P.3d at 759. The plaintiffs argued that the anti-abrogation clause protected suits brought against the government from legislative interference and that, by eliminating a claim for simple negligence, the statute violated the anti-abrogation clause. *Id.*

¶ 11 Our supreme court held, however, that the anti-abrogation clause was more general than the immunity clause and that the latter "directly addresses the authority of the legislature in relation to actions against the state" and applied the immunity clause to resolve the case. *Id.* at 199, ¶ 11, 16 P.3d at 760. It noted that, after the supreme court abolished sovereign immunity in *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 389, 381 P.2d 107, 109 (1963), a government was to be immune from suit only when necessary to avoid severely hindering a governmental function or thwarting an established public policy. *Clouse,* 199 Ariz. at 198–99, ¶ 9, ¶ 12, 16 P.3d at 759–60 (quoting *Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982)). But after the supreme court in *Ryan* invited the legislature to aid in determining when public entities and employees would be liable, the legislature adopted a series of statutes, including the one at issue. *Id.* at 199, ¶ 13, 16 P.3d at 760; *see generally* A.R.S. §§ 12–820 to –826 (2005) (Actions Against Public Entities or Public Employees Act); *City of Tucson v. Fahringer,* 164 Ariz. 599, 600, 795 P.2d 819, 820 (1990).

¶ 12 The court also observed that, even after abolishing sovereign immunity, the court nevertheless had enforced various stat-utes that conferred absolute or qualified immunity on public entities. *Clouse,* 199 Ariz. at 202, ¶ 21, 16 P.3d at 763. Thus, the court concluded that the immunity clause "confers upon the legislature a power to control actions against the state that it does not possess with regard to actions against or between private parties." *Id.* at 203, ¶ 24, 16 P.3d at 764. Accordingly, the legislature could define instances in which public entities and employees would be entitled to immunity, and, in this case, "th[e] specific statutory grant of partial immunity controls the degree of immunity afforded these defendants." *Id.* at ¶¶ 25–26, 16 P.3d at 757. But the court did "not address the liability of public entities for proprietary activity." *Id.* at 204, ¶ 28, 16 P.3d at 765.

¶ 13 Catherine concludes that the court adopted a narrow interpretation of the meaning of "state" in the immunity clause, but we do not agree. Nothing in *Clouse* suggests that the legislature had authority to grant either absolute or qualified immunity only to the state; clearly, the opinion upholds the legislature's authority with respect to "public entities and public employees." In fact, Justice Feldman dissented in part because the majority failed to clarify the impact of its decision on municipalities, particularly in light of the long history of holding municipalities liable when acting in a proprietary capacity. *Id.* at 213, ¶¶ 71–73, 16 P.3d at 774 (Feldman, J., dissenting). But the majority opinion does not hold that the immunity clause forbids the legislature from adopting a provision like A.R.S. § 9–500.02(A).

¶ 14 The City points out that the first published version of *Clouse* stated in part that "*the immunity statute we consider today applies only to public entities, which include the state and its political subdivisions ... so this opinion does not affect the status of municipalities.*" *Clouse ex rel. Clouse v. State,* 198 Ariz. 473, 481, ¶ 28, 11 P.3d 1012, 1020 (2000) (emphasis added). The court vacated and republished its opinion[4] to remove what it called "dicta in para-

---

4. Justice Feldman again dissented and objected that the majority failed to "indicate whether judicial redress for municipal and proprietary torts is or is not protected" by the anti-abrogation clause. *Clouse,* 199 Ariz. at 213, ¶ 71, 16 P.3d at 774 (Feldman, J., dissenting). He noted that "common law immunity of the state's subgovernmental units was not recognized or established

**434**

graph 28." 199 Ariz. at 198 n. 4, 16 P.3d at 759 n. 4. As revised, paragraph 28 states in relevant part:

> For instance, the immunity granted by statute extends to public employees acting within the scope of their employment, not to private activities of the employee, by the terms of A.R.S. section 12–820.02.A. A public employee's failure to retain an arrested person in custody involves clearly governmental activity. Accordingly, our holding today does not address the liability of public entities for proprietary activity.

*Id. at* 203–04, ¶ 28, 16 P.3d at 764–65. Thus, instead of excluding municipalities from its holding, the court emphasized the well-established distinction between proprietary and governmental functions as a basis for either imposing liability or finding immunity.[5]

¶ 15 Catherine nonetheless contends that cities are unlike other governmental entities because they are organized for local convenience and that, if the drafters of our constitution had intended to include cities in the immunity clause, they would have said so. We are not persuaded, however, that cities are unlike counties or other subdivisions of the state. Our constitution delegated to the legislature power to establish cities and towns. Ariz. Const. art. 13, § 1 ("[T]he legislature ... shall provide for the incorporation and organization of cities and towns ...."). Our cases have referred to cities as governmental subdivisions. *See Sanderson Lincoln Mercury, Inc. v. Ford Motor Co.*, 205 Ariz. 202, 206, ¶ 17, 68 P.3d 428, 432 (2003) ("cities and towns are no more than political entities created as the legislature deems wise"); *City of Tucson v. Fleischman*, 152 Ariz. 269, 272, 731 P.2d 634, 637 (App.1986) (city is included in statutory claims act's reference to political subdivisions of the state). The United States Supreme Court also has described municipalities as "political subdivisions of the state, created as convenient agencies for exercising

such of the governmental powers of the state as may be [e]ntrusted to them." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151 (1907), *limitation recognized in Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 70–71, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). In addition, the Actions Against Public Entities or Public Employees Act broadly defines "[p]ublic entity" as "this state and any political subdivision of this state." A.R.S. § 12–820(6).

¶ 16 From the majority's revised opinion in *Clouse*, which omitted the language excluding cities from its holding and instead focused on public employees engaged in governmental rather than proprietary functions, 199 Ariz. at 203, ¶ 28, 16 P.3d at 764, we do not infer that the legislature could not extend immunity to cities and city employees engaged in governmental functions. Thus, we conclude that A.R.S. § 9–500.02 does not exceed the legislature's powers to adopt statutes governing the immunity of the state and its political subdivisions if the public entities and employees, in providing emergency medical services, are acting in a governmental capacity.

¶ 17 We also are not persuaded by Catherine's argument that, if the immunity clause applied to actions brought against cities, the supreme court would have applied the clause in *Dickey ex rel. Dickey v. City of Flagstaff*, 205 Ariz. 1, 66 P.3d 44 (2003). In *Dickey*, the court did not analyze whether the immunity clause authorized the legislature to pass the recreational use statute, which conferred immunity on landowners unless they were guilty of willful, malicious, or grossly negligent conduct in causing injury to a recreational user. *Id.* at 2, ¶ 6, 66 P.3d at 45. The opinion does not reveal whether the plaintiffs raised the immunity clause as an issue, but it is possible that they did not because the recreational use statute applies to landowners generally, not specifically to governmental entities or employees. The

---

for all units or for all purposes. Cities, counties, and other subgovernmental entities could have been or were liable for a variety of activities, and rights of action arising from such situations existed under" prior interpretations of the anti-abrogation clause and were protected from abrogation. *Id.* at 214, ¶ 78, 16 P.3d at 775 (Feldman, J., dissenting).

**5.** The dissent noted that cities had been denied immunity "when engaged in proprietary functions" based on the "quaint" notion that "cities, unlike states, were unnecessary and formed only for the 'advantage and convenience' of their residents." *Id.* at 213, ¶ 73, 16 P.3d at 774 (Feldman, J., dissenting) (citations omitted).

plaintiffs did argue, however, that the statute violated the anti-abrogation clause by depriving them of a cause of action against the City of Flagstaff for simple negligence. *Id.* at 3, ¶ 8, 66 P.3d at 46.

¶ 18 Therefore, because *Clouse* upheld the legislature's authority to adopt statutes immunizing public entities and employees while acting in their governmental capacity, if the paramedics and EMTs acting on behalf of the City here were engaged in a governmental function, we conclude that A.R.S. § 9–500.02(A) does not violate the immunity clause. Catherine insists, however, that the performance of emergency medical services is a proprietary function that takes the City outside the grant of immunity for governmental functions.

## 2. Are emergency medical services a governmental function?

¶ 19 Catherine is correct that our courts have held that municipalities are not immune from liability when performing proprietary, ministerial, or corporate functions. *See Harlan v. City of Tucson,* 82 Ariz. 111, 115, 309 P.2d 244, 247 (1957); *Dillow v. City of Yuma,* 55 Ariz. 6, 8, 97 P.2d 535, 536 (1940); *City of Phoenix v. Mayfield,* 41 Ariz. 537, 545, 20 P.2d 296, 299 (1933). No Arizona case has decided whether the provision of emergency medical services is a proprietary or governmental function.

¶ 20 "Proprietary functions are defined as those activities conducted primarily to produce a pecuniary profit for the governmental agency" or to promote the municipality's private interests. Eugene McQuillin, *The Law of Municipal Corporations* § 53.23 at 384–85 (3d ed.2002). But if an undertaking is for the public benefit, and the municipality is acting as the agent of the state, a city may be regarded as acting in a governmental capacity. *Id.* at § 53.24 at 385–86. Thus, when the acts of a municipality are "done in the exercise of a corporate franchise conferred upon the [municipal] corporation for the public good, and not for private corporate advantage, the corporation is not lia-

ble for the consequences of such acts on the part of its officers and servants." *Id.* at 388, 20 P.2d 296.

¶ 21 Our supreme court applied the governmental/proprietary distinction in *Dickey* to determine whether a city could be liable for negligence in the operation of a park or was entitled to qualified immunity under a statute [6] that applied to landowners who allowed recreational use of their property. 205 Ariz. at 2, ¶ 5, 66 P.3d at 45. The trial court found that the statute's qualified immunity applied to the City of Flagstaff, that no evidence showed gross negligence, and that the statute did not violate the anti-abrogation clause by abolishing a cause of action that otherwise would have existed. *Id.* at ¶ 4, 66 P.3d 44. Our supreme court found that no right to sue a city for its performance of a governmental function was part of the common law at statehood. *Id.* at 5, ¶ 18, 66 P.3d at 48. Furthermore, maintaining a city park was a governmental function because the city derived no revenue from it, and the park was open to all citizens. *Id.* at 6, ¶ 22, 66 P.3d at 49. If the city would have been immune at common law for ordinary negligence in its maintenance of the park, the qualified immunity afforded by the recreational use statute did not abrogate a right to sue for negligence. *Id.* at ¶ 23, 66 P.3d 44.

¶ 22 Although Catherine asserts that providing emergency medical services is a proprietary function, she does not argue that these services are intended to produce a profit or to promote the City's private interests. In her reply brief, she contends that charging a fee for the services renders them a proprietary function. However, imposition of a fee is not determinative. Many courts have found that providing such services is a means to protect public safety and welfare by sending medically trained personnel as quickly as possible to emergency situations; it is a service available to everyone who calls, and even if a city charges a fee, but the services are not a profit-making venture, the services are not proprietary. We agree with

6. The statute provides that the owner of land held open for public use is not liable unless an injured person can show that "the owner . . . was guilty of willful, malicious or grossly negligent conduct which was a direct cause of the injury." A.R.S. § 33–1551(A) (2005).

these courts that, because emergency medical services like those rendered here provide a general public benefit and serve the public health and welfare,[7] they are a governmental function that may qualify for governmental immunity. The legislature may adopt statutes, such as A.R.S. § 9–500.02, to award qualified immunity.

¶ 23 Accordingly, we are not persuaded by Catherine's citation to *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 961 P.2d 449 (1998). She argues that the City of Phoenix did not even assert in that case that it was immune when it was sued for negligent handling of a 911 call asking for police assistance because the City of Phoenix assumed that ordinary negligence standards would apply to its actions while providing a proprietary service. She emphasizes the supreme court's statement that the City of Phoenix "had a duty to act reasonably in handling emergency calls," *id.* at 55, ¶ 26, 961 P.2d at 453, to argue that, if ordinary negligence standards applied to the City of Phoenix, provision of 911 services must be a proprietary function.

¶ 24 We decline to read so much into the supreme court's decision because it granted review only to decide whether a jury could compare the negligent conduct of the 911 operator with the intentional conduct of the shooter who killed two people who had called 911 to ask for police assistance. *Id.* at 53, ¶ 15, 961 P.2d at 451. Moreover, the court said that the City of Phoenix had a duty to act reasonably because this court had already determined that the City of Phoenix was not covered by a grant of qualified immunity to public entities for failure to retain an arrested person in custody. *See Hutcherson v. City of Phoenix*, 188 Ariz. 183, 190, 933 P.2d 1251, 1258 (App.1996). No arrest had occurred, the victims were killed before the police arrived, and thus the statute did not apply. *Id.* Neither opinion decided whether the 911 service was a proprietary function.[8]

¶ 25 Catherine additionally cites *Barnum v. Rural Fire Protection Co.*, 24 Ariz.App. 233, 537 P.2d 618 (1975), in which the plaintiff suffered losses in a fire and sued a private fire protection company for negligent firefighting. She argues that the services provided by a private firefighting company are like those provided by the City here and thus are proprietary. In *Barnum*, the court observed that, to determine the duty owed to one who has suffered damages from a fire, courts have examined the status of the one accused of careless firefighting, often a public body, and the courts have found no liability because of sovereign immunity. *Id.* at 235–36, 537 P.2d at 620–21. In such a case, unless the government had narrowed its general obligation to a special duty to an individual, it was not liable for a breach of duty. *Id.* at 236, 537 P.2d at 621. But the court held that the public/private duty rule did not

**7.** *See, e.g., McIver v. Smith*, 134 N.C.App. 583, 518 S.E.2d 522, 524–27 (1999) (ambulance service is not proprietary even though it could be and had been provided by private companies and county charged a fee; protecting health and welfare "is a legitimate and traditional function of county government," and legislature gave county power to operate such services; test is "whether the act is for the common good of all without the element of … pecuniary profit"); *Edwards v. City of Portsmouth*, 237 Va. 167, 375 S.E.2d 747, 749–50 (1989) (emergency ambulance service is a governmental function and authorized by the police power; it is not proprietary even though a fee was charged, service was not historically or exclusively provided by government, was used by choice, and was not provided by a governmental entity); *Bailey v. City of St. Louis*, 578 S.W.2d 279, 280 (Mo.App.1979) (no genuine issue of fact existed over whether ambulance service was a governmental operation); *Brantley v. City of Dallas*, 545 S.W.2d 284, 285 (Tex.Civ.App.1976) (emergency ambulance service is a governmental

function and city was not liable for employees' negligence in performing that function unless statute waived governmental immunity); *City of Memphis v. Bettis*, 512 S.W.2d 270, 273–74 (Tenn.1974) (ambulance service is a necessary function imposed by "basic mandate to protect … [citizens'] health, safety, and welfare" and is not for convenience of a few or for profit but to meet urgent public need). *Cf. Berkowski v. Hall*, 91 Mich.App. 1, 282 N.W.2d 813, 814 (1979) (citation omitted) (governmental function test no longer looks at whether activity is for common good but whether it is " 'of essence to governing;' " municipal hospital is proprietary, but mental hospital is governmental because of lack of private competition and state's financial involvement and responsibility for mental patients; EMS unit is more like former than latter).

**8.** We do not decide whether operating a 911 telephone network is a governmental function but only whether the City's provision of emergency medical services is a governmental function.

apply to a private, for-profit company that was not compelled to offer services to the public. *Id.* Because the defendant had no contract requiring it to respond to a fire at the plaintiff's premises, its duty was that of a mere volunteer, regardless of whether it was a governmental or private entity. *Id.* at 236–37, 537 P.2d at 621–22. The court did not hold that the defendant's services were proprietary.

¶ 26 Neither case demonstrates that providing emergency medical services is a proprietary function. Oddly, in response to Catherine's argument, the City contends that the governmental/proprietary distinction has been abandoned and is irrelevant in the context of statutory immunity. The City appears to have confused the public/private duty doctrine with the governmental/proprietary test. After the abolition of sovereign immunity, in 1982 the supreme court recognized the need for some governmental immunity. *Ryan*, 134 Ariz. at 310, 656 P.2d at 599. But the court discarded the public/private or general/specific duty concept, stating "[w]e shall no longer engage in the speculative exercise of determining whether the tortfeasor has a *general* duty to the injured party, which spells no recovery, or ... a specific individual duty which means recovery." *Id.*

¶ 27 Nevertheless, the governmental/proprietary distinction was applied in *Clouse* and *Dickey*. In *Clouse*, the majority held that "[a] public employee's failure to retain an arrested person in custody involves clearly governmental activity. Accordingly, our holding today does not address the liability of public entities for proprietary activity." 199 Ariz. at 203–04, ¶ 28, 16 P.3d at 764–65. In *Dickey*, because the City of Flagstaff held the park open to the public and did not charge admission or derive revenue from it, the park was a governmental function. 205 Ariz. at 5–6, ¶¶ 20–23, 66 P.3d at 48–49.

¶ 28 Furthermore, because we have determined that the City was engaged in a governmental function when providing emergency medical services, if the City would have been immune for simple negligence while acting in a governmental capacity under the common law as it existed at statehood, A.R.S. § 9–500.02(A) does not violate the anti-abrogation clause of our constitution,[9] which provides that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." Ariz. Const. art. 18, § 6. *Dickey* observed that the clause "protects from legislative repeal or revocation those ... actions that 'either existed at common law or evolved from rights recognized at common law.'" 205 Ariz. at 3, ¶ 9, 66 P.3d at 46. To be protected by the anti-abrogation clause, a right of action for negligence against a city "must have existed at common law or found its basis in the common law at the time the constitution was adopted." *Id.*

¶ 29 *Dickey* concluded that no "right of action for simple negligence, *against a municipality engaged in a governmental function*, existed at common law." *Id.* (emphasis added). The court cited *Jones v. City of Phoenix*, 29 Ariz. 181, 183, 239 P. 1030, 1031 (1925), *overruled in part by Stone*, 93 Ariz. 384, 381 P.2d 107, for holding that the city's liability in negligence "turned upon whether the function ... was 'proprietary' or 'governmental' because when a municipality was 'acting in its governmental capacity, it had the exemptions of ... sovereignty.'" 205 Ariz. at 4, ¶ 13, 66 P.3d at 47. Because the City of Flagstaff would have been totally immune from suit at common law for ordinary negligence if operating a park was a governmental activity, and the court determined that a park was a governmental activity, the recreational use statute did not abrogate a common law cause of action that the plaintiff otherwise would have possessed, and the City of Flagstaff could assert qualified

---

9. Our supreme court has held that "[t]he common law, so far as it is not repugnant to the Constitution of the United States, the constitution or laws of this state, or established customs of the people of this state, was adopted by the Legislature and is 'the rule of decision in all courts of this state.'" *Huebner v. Deuchle*, 109 Ariz. 549, 550, 514 P.2d 470, 471 (1973) (citation omitted) (declining to permit a wrongful death action against the decedent's husband without express statutory authority because of the common law interspousal tort immunity).

immunity. *Id.* at 5–6, ¶¶ 20–23, 66 P.3d at 48–49.

¶ 30 Similarly, because the City would have been totally immune from suit at common law for ordinary negligence [10] while acting in a governmental capacity, and it was acting in that capacity by providing emergency medical services, A.R.S. § 9–500.02(A) does not violate the anti-abrogation clause. Accordingly, the trial court did not err in concluding that A.R.S. § 9–500.02(A) is constitutional and that the legislature could confer qualified immunity on the City. Thus, we uphold its ruling denying summary judgment to Catherine, rejecting her assertion that she was entitled to sue the City for simple negligence, and requiring that she show "gross negligence or intentional misconduct" in order to recover.

## B. Jury instruction on failure to retain evidence

¶ 31 Catherine next argues that the trial court seriously prejudiced her ability to prove essential elements of her case by refusing to instruct the jury that it could draw an adverse inference from the City's failure to preserve data strips from the cardiac monitoring device used during the ambulance ride to the emergency room. She contends that the strips were critical to understanding Aaron's pulse rate and when cardiac arrest actually occurred.

¶ 32 To support her request for the instruction, Catherine argued that the City should not gain an advantage from loss of the strips and that, by statute, a health care provider must retain the original copies of a patient's medical record. *See* A.R.S. § 12–2297 (2005). She also cited *State v. Willits*, 96 Ariz. 184, 191, 393 P.2d 274, 278 (1964), in which our supreme court reversed a conviction because the trial court refused to give an instruction permitting the jury to infer, if it found the state destroyed critical evidence, that the true fact was against the state's interest. Catherine asked that the jury be instructed that the strips were no longer available, that they were last in the City's possession, and that "[y]ou may draw an adverse inference. [and] may believe that the evidence, if preserved, would have been unfavorable to the Defendant on whether Defendant complied with the standard of care and whether Defendant's treatment was a cause of Aaron Smyser's death." The City argued in response that Arizona does not recognize spoliation [11] as a tort, that loss of the strips

---

**10.** Because there was never a cause of action for ordinary negligence against a municipality at the time of statehood, *Young v. DFW Corp.*, 184 Ariz. 187, 908 P.2d 1 (App.1995), as discussed in *Lindsay v. Cave Creek Outfitters, L.L.C.*, 207 Ariz. 487, 493–94, ¶¶ 23–24, 88 P.3d 557, 563–64 (App. 2003), is distinguishable. In *Lindsay*, the plaintiffs, a wife and husband, sued the defendant, the operator of a riding stable, for personal injuries sustained by the wife when she was thrown from a horse. *Id.* at 489, ¶ 2, 88 P.3d at 559. The plaintiffs alleged that the defendant's conduct was both negligent and willful and outrageous. *Id.* Among other allegations, the plaintiffs argued that a statute that immunized an equine owner from an ordinary negligence claim by a person riding the equine if four conditions were met, one of which was that the rider had signed a release before taking control of the equine, violated the anti-abrogation clause and thus was unconstitutional because it took away the right of an injured rider to sue an equine owner for ordinary negligence. *Id.* at 493, ¶ 21, 88 P.3d at 563.

The plaintiffs cited *Young* for the proposition that changing a standard of proof from ordinary negligence to gross negligence for a particular class of tort victims would violate the anti-abrogation clause. *Id.* at ¶ 23, 908 P.2d 1 (citations omitted). *Young* held that a statute that required a plaintiff to establish more than general negligence to prove dram shop liability was unconstitutional because "the statute did 'not merely "regulat[e] the mode, method, and procedure to be followed in pursuing the cause of action ... [but] completely deprive[d] many who have sustained real injury of a judicial remedy." ' " *Id.* We distinguished the equine owner immunity statute at issue in *Lindsay* from the dram shop statute in *Young* on the basis that, in *Young*, the statute denied all plaintiffs alleging dram shop liability the right to proceed under ordinary negligence principles, whereas the equine owner immunity statute did not deny all riders or renters the right to sue for ordinary negligence but rather denied ordinary negligence claims to those who elected to sign a release and met the other criteria in the statute. *Id.* at 493–94, ¶ 24, 88 P.3d at 563–64. This case also does not abrogate a cause of action at common law because, at that time, sovereign immunity ruled, and there was no cause of action for ordinary negligence against a municipality.

**11.** Spoliation is defined as "[t]he intentional destruction of evidence.... The destruction, or the significant and meaningful alteration of a document or instrument." BLACK'S LAW DICTIONARY 1257 (6th ed.1990).

did not cause unfair prejudice because Catherine had been able to reconstruct the information that the strips contained, and that the instruction would lead the jury to think that the City intentionally failed to keep the strips when no evidence showed that to be true. The trial court declined to give the requested instruction.

¶ 33 The trial court has substantial discretion in determining how to instruct the jury. *Cotterhill v. Bafile,* 177 Ariz. 76, 80, 865 P.2d 120, 124 (App.1993). The trial court need not give every requested instruction but should give an instruction if the evidence supports it, the instruction properly states the law, and the instruction relates to an important issue and is not duplicative or cumulative. *Dunn v. Maras,* 182 Ariz. 412, 418, 897 P.2d 714, 720 (App.1995). We will not overturn a verdict unless we have "substantial doubt about whether the jury was properly guided." *City of Phoenix v. Clauss,* 177 Ariz. 566, 568, 869 P.2d 1219, 1221 (App. 1994). Even erroneous instructions do not compel reversal "unless the error prejudiced the appellant's substantial rights," and prejudice affirmatively appears in the record. *Id.* at 568–69, 869 P.2d at 1221–22. We do not find reversible error in this case.

¶ 34 The record reveals that the strips were missing, but no evidence showed who caused their loss or that the City had intentionally or negligently destroyed them. Thus, one of the EMTs said that he believed Aaron had been connected to a heart monitor, but he did not know what happened to the strips upon arrival at the hospital. The emergency room nurse testified that the paramedics normally tape the strips to the back of their own report, which goes into the patient's hospital chart, and that neither the paramedics' report nor the strips were in Aaron's chart. Furthermore, Catherine's expert witness testified that, without the strips, he could not examine the cardiac rhythms and could not say when CPR should have been started.

¶ 35 Catherine contends that determining when Aaron went into cardiac arrest was critical to whether he was properly intubated and whether the paramedics met the standard of care, both important issues. But we question how important the strips were because the emergency room doctor did not recall even looking at the strips or asking to do so after Aaron arrived at the hospital. He testified merely that "[s]ometimes they're helpful." Catherine also argues that she was forced to rely on inferences to reconstruct information that would have been revealed by the strips and that the City should not be allowed to benefit from losing the strips. But if she could reconstruct what likely occurred during the ambulance ride from other available information, such as the depositions of the paramedics and EMTs and the hospital's records documenting Aaron's condition upon arrival, we fail to see how her case was unfairly prejudiced or how the City benefited from the loss of the strips.

¶ 36 Both parties cite *Souza v. Fred Carries Contracts, Inc.,* 191 Ariz. 247, 955 P.2d 3 (App.1997), as a civil case in which evidence was lost before trial. There, the trial court essentially dismissed the plaintiff's negligence case because her automobile had been destroyed before it could be examined by the experts. *Id.* at 249, 955 P.2d at 5. We agreed that litigants have a duty to preserve relevant evidence, but we rejected a rigid rule for such cases as "ill-advised" and held that destruction of evidence should be evaluated case-by-case, considering a "continuum of fault" and imposing penalties accordingly. *Id.* at 250, 955 P.2d at 6. An innocent failure, for example, should be of less concern than intentional destruction or failure to comply with a court order or discovery obligation to preserve or produce evidence. *Id.* We reversed the dismissal because the defendant had some warning of the car's potential destruction but did nothing to preserve it. *Id.* at 251, 955 P.2d at 7. Moreover, nothing showed that the defendant was unable to defend or that its expert would be unable to offer opinions on causation or to challenge the plaintiff's expert. *Id.* We also held that the trial court erred in failing to consider less severe sanctions. *Id.* The City argues that, as in *Brewer v. Dowling,* 862 S.W.2d 156 (Tex.App.1993), neither party intentionally or accidentally destroyed the evidence and that loss of the evidence did not prevent Cather-

ine from presenting her case and reconstructing the events.

¶ 37 Other courts considering whether loss of evidence merits an instruction allowing an adverse inference generally require evidence of either bad faith or intentional destruction. *See Med. Lab. Mgmt. Consultants v. Am. Broad. Co., Inc.*, 306 F.3d 806, 823–24 (9th Cir.2002) (plaintiff asked that jury infer from loss of lab slides that the slides were normal and would show falsity of defendant's statement that plaintiff had misread them; court did not abuse discretion in declining to give instruction because no evidence showed bad faith or intentional misconduct, and plaintiff had other means to challenge the statement); *Keller v. U.S.*, 58 F.3d 1194, 1197–98 (7th Cir.1995) (defendant failed to produce a copy of a blood pump record but court declined to give instruction on negative inference because evidence showed only that records could not be located but no bad faith or willful destruction); *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718–19 (Iowa 2001) (instruction that jury may infer that the missing evidence would be unfavorable has evidentiary and punitive purpose but only for intentional rather than negligent destruction, and the evidence must have been controlled by the "party whose interests would naturally call for its production"); *Brewer*, 862 S.W.2d at 159–60 (no error to decline to give spoliation instruction; although fetal monitor strip was missing, and plaintiff's expert testified it very likely would have shown fetal distress, defendants offered contrary evidence from witnesses and notes; no evidence showed intentional or accidental destruction but only that it was missing).

¶ 38 In this case, the emergency room doctor said that Aaron was in full cardiopulmonary arrest upon arrival and that the paramedics should have started resuscitation efforts at least five to ten minutes earlier. Without the strips, he could not say precisely when CPR should have been begun. But he also said that the paramedics should have made two attempts at oral intubation before the nasal intubation, that they fell grossly below the standard of care in attempting the latter, and that brain damage began before Aaron arrived at the emergency room be-

cause the nasal tube had not been delivering oxygen for at least five or ten minutes before arrival. Therefore, determining precisely when Aaron's heart stopped was not critical to determining whether the paramedics fell below the standard of care. We conclude that, when no evidence shows intentional or bad faith destruction of evidence, particularly when Catherine had other means to establish what the strips likely would have revealed, a spoliation instruction was not mandatory and the failure to give it was not reversible error.

## C. Testimony regarding best efforts

¶ 39 Catherine also contends that the trial court erred in permitting the City to elicit testimony that its employees were trying their best when treating Aaron and exacerbated this error by failing to give an instruction that whether the paramedics had tried their best was immaterial to the standard of proof, i.e., that of a reasonably prudent health care provider. Catherine notes that the trial court granted her motion in limine that the City not be allowed to question any *expert* as to whether the paramedics tried their best or ignored or abandoned Aaron but then allowed these questions to be asked. We review the trial court's rulings on the admission of evidence for an abuse of discretion. *See Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 506, 917 P.2d 222, 235 (1996).

¶ 40 Catherine's motion in limine was directed at barring expert witnesses from commenting on the paramedic's "best efforts" or caring attitude. She does not indicate where in the record any expert answered questions about the paramedics' attitudes or best efforts. The record does show that the City asked the emergency room physician whether, from his interaction with the paramedics in the emergency room, they appeared to be "professional and caring about Mr. Smyser." The trial court overruled Catherine's relevancy objection, and the doctor said yes. In questioning an emergency room nurse, the City asked whether the paramedics appeared to act in a professional manner and to be concerned with Aaron's well-being. Over an objection, the nurse said that she could not recall. Catherine also cites a similar question to one of the EMTs.

None of these persons testified as experts but rather as witnesses to the events and thus the trial court did not fail to enforce Catherine's motion.

¶ 41 Even if these three witnesses were not testifying as experts, Catherine maintains that the questions interjected an improper evidentiary standard "designed to prejudice the jury" and led to a prejudicial outcome because the jury thought it could evaluate the care on a "tried their best" standard. The trial court properly instructed the jury that

[m]edical negligence is the failure to comply with the applicable standard of care. To comply with the applicable standard of care, a paramedic or EMT must exercise that degree of care, skill, and learning that would be expected under similar circumstances of a reasonably prudent paramedic or EMT within this state.

¶ 42 From these few questions and brief answers in an eight-day trial, we cannot agree that they "undoubtedly created an indelible mental impression upon the jury," as Catherine asserts, or that they caused any unfair prejudice. Thus, we do not find reversible error. *See id.* at 506, 917 P.2d at 235 (we will affirm, even if we find error in admission or exclusion of evidence, in the absence of prejudice).

## D. Award of sanctions pursuant to Arizona Rule of Civil Procedure 68

¶ 43 Catherine, as surviving spouse of Aaron, and on behalf of herself, Aaron's two minor children, and Aaron's parents, brought this action for medical malpractice and wrongful death. Before trial, the City made an unapportioned offer of judgment to all parties of $75,000. The offer was not accepted. The City sought and was awarded $28,162.50 in sanctions pursuant to Arizona Rule of Civil Procedure 68(d) as part of an award of taxable costs totaling $57,786.25. In response to Catherine's objections, the trial court amended the judgment to reduce the expert witness fees but found that, because Catherine had submitted an unapportioned offer of judgment to the City, she could not protest that, because the City's offer was unapportioned, it failed to comply

with Rule 68(d). The final judgment included $28,162.50 in sanctions.

¶ 44 Catherine now challenges the award. Rule 68(d) provides that an offer that is not accepted is not admissible

except in a proceeding to determine sanctions under this Rule. If the judgment finally obtained is equal to, or more favorable to the offeror than the offer, the offeree must pay, as a sanction, those reasonable expert witness fees and double the taxable costs of the offeror ... incurred after the making of the offer, and prejudgment interest on unliquidated claims to accrue from the date of the offer.

The Rule's purpose is to encourage settlement. *McEvoy v. Aerotek, Inc.,* 201 Ariz. 300, 305, ¶ 25, 34 P.3d 979, 984 (App.2001).

¶ 45 Catherine cites *Greenwald v. Ford Motor Co.,* 196 Ariz. 123, 126, ¶ 10, 993 P.2d 1087, 1090 (App.1999), and *Duke v. Cochise County,* 189 Ariz. 35, 41, 938 P.2d 84, 90 (App.1996), to argue that an unapportioned joint offer cannot support imposition of Rule 68 sanctions. In *Duke,* a surviving spouse brought an action on her own behalf and that of her adult children for the wrongful death of her husband; she also asserted personal claims for false imprisonment and emotional distress. 189 Ariz. at 37, 938 P.2d at 86. She offered to confess judgment for $2 million, but the defendant declined. *Id.* at 40, 938 P.2d at 89. We held that one receiving

an unapportioned joint offer cannot make a meaningful choice between accepting the offer on any single claim or continuing the litigation ... on all claims. Imposing sanctions for failing to accept what is in effect an unspecified and unapportioned offer of judgment deprives the offeree of the opportunity to assess his or her chances of doing better at trial against one or more of the parties covered by the joint offer.

*Id.* at 41, 938 P.2d at 90. Because the Rule uses the singular form of "offer," an unapportioned joint offer was invalid. *Id.*

¶ 46 Similarly, in *Greenwald,* the personal representative, on behalf of a surviving spouse and the parents of the deceased,

brought an action for wrongful death and, alternatively, for negligence and strict product liability. 196 Ariz. at 124, ¶ 2, 993 P.2d at 1088. The defendant made a lump-sum offer of judgment that was not accepted, the jury returned a defense verdict, and the defendant moved for Rule 68 sanctions. *Id.* at ¶ 3, 993 P.2d 1087. The trial court found that, under *Duke*, the offer was unapportioned and improper, *id.*, and we affirmed, *id.* at 126, ¶ 10, 993 P.2d at 1090. We held that, to justify Rule 68 sanctions, an offer must comply with the Rule's requirements, particularly the need for specificity. *Id.* at 124–25, ¶¶ 5–6, 993 P.2d at 1088–89. The defendant argued that, unlike *Duke*, the plaintiff asserted only a wrongful death claim, which is a single action involving one plaintiff. *Id.* at 125, ¶ 7, 993 P.2d at 1089. We agreed but held that, because the personal representative represents all of the beneficiaries, and the offer was not apportioned among them, the offer did not satisfy the rule. *Id.* at 125–26, ¶ 8, ¶ 10, 993 P.2d at 1089–90. In assessing damages for wrongful death, the jury awards compensation to each beneficiary, *id.*, and the plaintiff holds the proceeds in trust for each, *id.* at ¶ 9. Thus, to permit evaluation, an offer in a wrongful death case must apportion the damages among the various beneficiaries. *Id.* at 126, ¶ 10, 993 P.2d at 1090.

¶ 47 The City argues, however, that a single unapportioned offer to a parent who brings an action on her own behalf and that of minor children would not bar Rule 68 sanctions, citing *Sheppard v. Crow–Barker Paul No. 1 Ltd. P'ship*, 192 Ariz. 539, 549, ¶ 58, 968 P.2d 612, 622 (App.1998). In that case, a parent brought suit to recover costs he incurred for his child's medical care as well as to recover on the child's behalf for the child's injuries. *Id.* We acknowledged that the claims were divided because of the child's minority and that normally both aspects of injury would be sought by the injured person. Thus, "the *Duke* rationale [was] inapplicable." *Id.* Unlike *Sheppard*, this action was also on behalf of Aaron's parents, and we are not persuaded by *Sheppard* that a different result applies simply because Catherine

brought claims on behalf of her minor children. Each beneficiary is entitled to damages based on his or her pecuniary loss, and the damages should have been split between Catherine and her children not based on the children's minority but on the separate nature of the loss suffered by each.

¶ 48 We give no weight to the City's argument that Catherine submitted an unapportioned offer and cannot complain that the City's offer was unapportioned. If she had prevailed and sought an award under Rule 68, the trial court would have been entitled to deny her request. Catherine's offer is not a reason to ignore the holdings in *Duke* and *Greenwald.*

¶ 49 Therefore, the City's unapportioned lump-sum offer did not comply with Rule 68 because it did not allocate damages among the beneficiaries. We vacate the judgment awarding sanctions to the City and remand for the trial court to amend its judgment to delete the award of $28,162.50 in sanctions.

### E. Attorneys' fees on appeal

¶ 50 The City requests an award of its attorneys' fees and costs on appeal pursuant to Arizona Rule of Civil Appellate Procedure 21. The Rule "only sets forth the procedure for requesting fees; it does not provide a substantive basis for a fee award." *Bed Mart, Inc. v. Kelley*, 202 Ariz. 370, 375, ¶ 24, 45 P.3d 1219, 1224 (App.2002). We deny the request.

### CONCLUSION

¶ 51 We find no error in the trial court's order denying summary judgment to Catherine in light of our conclusion that the City was engaged in a governmental function when providing emergency medical services and that the City was entitled to the qualified immunity provided by A.R.S. § 9–500.02. We find no abuse of discretion in the trial court's decision declining to give the spoliation instruction or allowing limited questions about the paramedics' and EMTs' best efforts. Accordingly, we affirm the judgment except that we remand for modification to delete the award of Rule 68 sanctions to the City.[12]

12. Southwest Ambulance and Rescue of Arizona, Inc., d.b.a. Southwest Ambulance, and the City of

CONCURRING: MAURICE PORTLEY, Presiding Judge and DANIEL A. BARKER, Judge.

Phoenix filed amicus curiae briefs. This decision does not address the questions posed in those briefs.